# · CHARLESTON.

## STATE v. TERRALL.  -

Submitted October 31, 1916.  Decided November 28, 1916.

1. HOMICIDE—*Evidence—Admissibility*.

    In a trial for murder, where it is shown that bad feeling had existed between the families of the accused and the deceased for some time, and that their wives engaged in a fight on the evening preceding the homicide, which was the cause of the fatal encounter between accused and deceased, testimony by the wife of deceased tending to show that she and the wife of the accused had unpleasant words nearly every time they met, and that, if they were not in speaking distance, the wife of the accused would make offensive signs at her, constitute a link in the chain of circumstances leading up to the fatal affray, and is admissible. (p. 360).

2. SAME—*Evidence—Admissibility—Habits of Accused*.

    Although the State's evidence tends to prove that the accused had sworn profanely at deceased and his wife, immediately before the fatal affray began, testimony of a witness for accused, concerning his habits respecting the use of profanity, is properly rejected. A man may sometimes swear profanely, although it is not his habit to do so. (p. 361).

3. WITNESSES—*Credibility—Evidence*.

    If, upon his examination in chief, the fact is made to appear that a witness for the accused is related to him, the offer to prove by such witness that he and the accused had not been on speaking terms for sometime previous to the trial, is properly rejected, his credibility not otherwise being called in question. It is not proper to bolster up a witness before his credibility has been attacked. (p. 362).

4. CRIMINAL LAW—*Trials—Confrontation of Witnesses*.

    On his examination in chief, a witness for the accused was asked what had been the state of feeling between himself and the accused, and the court sustained an objection to the question, and refused to permit the witness to answer it, and, in order to show what his answer would have been, if he had been permitted to answer, for the purpose of making the rejected evidence a part of the record, for consideration of this court on writ of error, the judge, the opposing counsel and the witness retired to an anteroom, out of the presence and hearing of the jury and the accused, and the questions were then permitted to be asked and answered and were made a part of the record. *Held:* The evidence not being admis-

sible, this was not error. Having ruled on the motion and rejected the evidence, when it was first offered, in the presence of the accused and the jury, the hearing of the evidence by the judge, out of the presence of the accused and the jury, was not a matter which affected, in any manner, the trial of the accused in the court below.   (p. 362).

5.   HOMICIDE—*Trial—Instruction—''Assault.''*

Where the State's theory, supported by its evidence, is, that the accused went to the home of the deceased, armed with a shotgun, and made use of violent language toward deceased and his wife and called to them to come out of their ''dirty den'', and also pointed his gun toward the house, before deceased came out, an instruction defining an assault as ''a verbal threat of violence against another accompanied with the present capacity to execute such a threat, or is a movement which virtually implies a threat to strike or otherwise do violence to the person of another,'' and submitting to the jury the question whether or not the accused made such assault and thereby provoked the combat which resulted in the homicide, and telling them they should not acquit the accused on the plea of self defense, unless they further believed from a preponderance of the evidence, that, before the fatal shot was fired, the accused declined further combat and retreated as far as he could with safety, and killed deceased in order to preserve his own life, or the life of his wife, who was with him at the time, or to protect her or himself from great bodily harm, was properly given.   (p. 363).

6.   SAME—*Evidence—Admissibility.*

Where the fact is clearly proven, and not denied, that deceased was killed with shot fired from a rapid firing shotgun, fired by the accused, it is not reversible error to admit evidence tending to show the number of shot usually contained in a shell of the kind and caliber used by defendant at the time of the shooting.   (p. 365).

Error to Circuit Court, Summers County.

C. V. Terrall was convicted of voluntary manslaughter, and he brings error.

*Affirmed.*

*Wm. H. Sawyers* and *R. F. Dunlap,* for plaintiff in error.

*A. A. Lilly,* Attorney General, and *John B. Morrison* and *J. E. Brown,* Assistant Attorneys General, for the State.

WILLIAMS, PRESIDENT:

C. V. Terrall was tried on an indictment for the murder of E. L. Richmond, convicted of voluntary manslaughter and sentenced to serve a term of five years in the penitentiary, and assigns error.

The first error assigned is, that the court improperly admitted evidence to show the unfriendly demeanor of the defendant's wife toward the wife of deceased, prior to the homicide. Defendant and deceased were rival merchants in the little town of Meadow Creek, on the Chesapeake & Ohio Railway, and had a disagreement over the settlement of an account, which Richmond had made at Terrall's store, sometime before the homicide, but no serious trouble occurred between the two families until the evening before, when Mrs. Terrall, accompanied by her two small children, was returning from a show, which had been exhibited at a nearby school house, and a fight occurred between her and Mrs. Richmond about opposite, and near to the latter's house. They were separated by Mr. Richmond. Mrs. Terrall went immediately to her husband's store and related the occurrence to him. Her face was bruised, and she told him Mrs. Richmond had struck her in the face with a stone. The next morning about eight o'clock defendant and his wife went to the place where the women had fought, defendant taking his shotgun with him, for the following reason, as he swears: ''Well, realizing the fact that my wife had been treated so severely the night before, and beat and bruised up, and thinking that if the feeling was such that my wife would be attacked and beat in such a manner, that probably on seeing us there the next morning, that probably even a more dangerous assault might be made on us, and thinking probably that this would—in taking my gun along would keep down further trouble.''

Three of the state's witnesses swear that defendant, while standing near Richmond's house, on the railroad track, used vulgar, profane and abusive language toward deceased and his wife, and called to them to come out of their dirty den. Deceased then came out, armed also with a shotgun, and the shooting immediately occurred. Deceased fired one shot, a number of the shot striking defendant's body, and defendant

fired four or five shots, in rapid succession, all but the first
one striking deceased, causing his death in a few minutes
thereafter. The evidence is conflicting as to which one of
them fired first. Three of the state's witnesses swear defend-
ant did, and a number of his witnesses swear deceased fired
first.

While Mrs. Richmond was being examined in chief by the
attorney for the state, she was asked if she and Mrs. Terrall
had had difficulty in the way of words before the night pre-
ceding the homicide, to which she replied: "Yes sir, we had
words nearly every time we saw one another, because every
time she would see me, no matter where, if I wasn't in hear-
ing distance she would make signs, and make fun of me, and
if I was in hearing distance she would 'ha ha!' and laugh
and twist, and make some kind of remarks and make fun of
me." This was objected to, and a motion to strike it out was
overruled, and an exception taken. The homicide grew out
of the difficulty which had occurred between the two women
the evening before, and the question was simply for the pur-
pose of ascertaining the state of feeling between them, prior
thereto, and, if possible, the cause of the encounter between
them. Although unimportant, the evidence was not wholly
irrelevant. It was simply leading up to the difficulty, which
was the immediate cause of the homicide. It was a link in
the chain of circumstances preceding and causing the fatal
affray between the respective husbands of the women, and its
admission does not call for reversal.

Witnesses for the state had testified that, just before the
shooting, defendant had sworn profanely at deceased and his
wife, and when defendant's father-in-law was testifying in
his behalf, he was asked if he knew his habits, as to the use
of profanity, and the court sustained an objection to the ques-
tion, and refused to permit the witness to answer it, and this
is assigned as error. Although not generally in the habit of
swearing, a man may, nevertheless, swear occasionally.
Whether defendant did actually swear on the occasion, as
testified to, is not a fact sufficiently material to the determin-
ation of his guilt or innocence of the crime charged, to be
made an issue in the case. Both he and his wife deny that he

swore, but whether he was in the habit of swearing was not material.

Dan Gwinn testified in defendant's behalf, and the first question propounded to him by defendant's counsel was: "Mr. Gwinn, you are a brother of Mrs. Terrall, are you?", to which he gave an affirmative answer. Counsel then offered to prove by this witness, that he and defendant had not been friendly for about a year and had not spoken to each other, until a few days before the trial, when defendant called to him on the street. This testimony was offered for the purpose of overcoming any prejudice the jury might have against his testimony on account of his bias toward defendant because of the relationship. The court refused to allow the evidence to go to the jury and an exception was taken. There is authority for the proposition, that where it is attempted to show the bias of a witness in favor of the party for whom he testifies, such party may show that he and the witness are not friendly. But it is not necessary for us to decide that question, because, granting that it would be proper to do so where the opposite party had attempted to show the bias of the witness in order to weaken his testimony, it would certainly not be proper to strengthen the witness' testimony by such evidence, before it had, in some manner, been questioned by the opposing party. Defendant could not prove the relationship, and then seek to overcome any supposed bias in his favor, by establishing the existence of an unfriendly feeling between the witness and himself. The witness was asked what had been the state of feeling between himself and defendant, and the court, on objection by the state's counsel, refused to permit it to be answered. After the court had so ruled, and simply for the purpose of making the rejected evidence a part of the record for consideration by this court, on writ of error, the judge, the opposing counsel and the witness retired to an anteroom, out of the presence of the jury and the defendant, and the questions were asked and answered, and are certified as a part of the record. It is insisted that this was a violation of defendant's constitutional right, and is reversible error. There are decisions by this court and also by the supreme court of Virginia which, in

effect, hold that it is reversible error to take any step, hear any motion, or admit a word of evidence, however immaterial, in the trial of a felony, when the accused is not present. The latest case decided by this court involving that point is *State* v. *Sutter*, 71 W. Va. 371. After the close of the evidence, in the trial of that case, the judge and the opposing counsel retired to another room, leaving the accused and the jury in the court room, and counsel for accused then moved to strike out the evidence of a certain witness who had testified on behalf of the state. The motion was argued and ruled on adversely to the accused, before his absence was observed. He was then sent for, and the judge offered to rehear the argument of the motion, and again rule on it in the accused's presence, and he refused his consent thereto. He was tried and convicted, and, on writ of error, a majority of this court held it to be reversible error. I dissented because I thought, and still so think, that the right of an accused to be present at the hearing by the court of a mere motion to exclude evidence, was a right which he could waive, and did waive in that case by his refusal to consent to a rehearing of it in his presence. The alleged error in this case is even more technical. It can not be said that the taking of rejected evidence, for the sole purpose of making it a part of the record, was a step taken, or a thing done in the progress of the trial and relating thereto, which could, in the remotest way, affect defendant's rights. The trial judge made no ruling and considered no motion in the absence of the prisoner. The objection to the proposed evidence had been ruled on by the judge in the presence of the prisoner. The only thing done, after the court and counsel retired to the anteroom, was to make the rejected evidence a part of the record in order that this court could determine whether its rejection was proper. That was certainly not reversible error.

The giving of the following instruction on behalf of the state is seriously complained of:

"The court instructs the jury that in law an assault is a verbal threat of violence against another accompanied with the present capacity to execute such a threat, or is a movement which virtually implies a threat to strike or otherwise

do violence to the person of another; and the jury are further instructed that if they believe from the evidence beyond a reasonable doubt that the prisoner C. V. Terrall by such an assault provoked the combat which resulted in his killing E. L. Richmond, then they should not acquit the prisoner under his plea of self defense unless the jury further believe from a preponderance of the evidence that before the fatal shot was fired the prisoner in good faith had declined further combat and retreated as far as he could with safety to himself, and that he necessarily killed the said Richmond in order to preserve his own life, or that of his wife, or to protect himself, or his wife, from great bodily harm.''

The state's theory is, that defendant was the aggressor and went to deceased's house, armed for the purpose of provoking the difficulty, and did provoke it and then killed deceased. The theory of the defense is, that deceased was the aggressor, and defendant shot in order to protect his own life. There is evidence tending to support either theory, and the jury were the sole judges of which theory was correct. That defendant went to the place where the fight had occurred between his wife and Mrs. Richmond the night before, armed with a loaded, rapid firing shotgun, is admitted by him. He gave his explanation of why he went armed. The jury were the proper tribunal to determine, from the conflicting evidence, for what purpose he was armed. Two or three witnesses for the state testified that he pointed the gun toward Mrs. Richmond, and called to the Richmonds to come out of their dirty den and throw some more rocks. This was before deceased came out of his house. According to the state's evidence Mrs. Richmond was then standing on the porch. A man can not challenge a combat and go to it armed, take his assailant's life and then justify the homicide on the ground of self defense. ''While a man may act safely on appearances, and is not bound to wait until a blow is received, yet he can not be the aggressor and then shield himself on the assumption that he was defending himself.'' Wharton's Criminal Law, (11th ed.), sec. 613. Although there is serious conflict in the testimony as to who fired the first shot, there is no pretense that defendant offered to withdraw from the

encounter.   The evidence is uncontradicted that, after he had fired the first shot, he continued to fire, in rapid succession, until he had shot four or five times.   In view of the state's evidence tending to support its theory, we find no fault with the instruction.

· The admission of evidence to prove the number of No. 2 shot in a twelve guage shell, that being the gauge of the gun with which defendant killed deceased, is assigned as error. We scarcely think this assignment merits consideration, in view of the undisputed facts.   That defendant shot and killed deceased with a shotgun, a number of shot entering his body, is an undisputed fact.   What difference then does it make whether he killed him with shells loaded with fifty, or a hundred shot, or whether the size of the shot was No. 2 or No. 3?

The judgment is affirmed.

*Affirmed.*